UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11

GENESIS HEALTH VENTURES,                  .    Case No. 00-2692(JHW)
INC., et al.,                             .    Jointly Administered

          Debtors.                        .    February 8, 2005
                                          .    10:00 a.m.
-------------------------------.              (Wilmington)
MELLON BANK, N.A.,                        .
                                          .
          Plaintiffs,                     .
                                          .
     v.                                   .    Adv. No. 04-55080(JHW)
                                          .
NEIGHBORCARE, INC.,                       .
                                          .
          Defendants.                     .
                                          .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



1    Ms. HARVEY: Good morning, Your Honor. Diane Harvey

2   from Weil Gotshal representing Defendant NeighborCare,

3   formerly Genesis Health Ventures. Before Your Honor today is

4   NeighborCare's motion to dismiss Mellon Bank's complaint

5   seeking indemnification under a DIP financing agreement with

6   respect to claims asserted against Mellon in the Haskel

7   (phonetic) complaint. Which I know Your Honor is familiar

8   with. And also before the Court is Mellon Bank's cross

9   summary judgement motion. Your Honor, we submit that the DIP

10   financing agreement, on it's face, simply does not provide

11   Mellon with the broad indemnification rights it seeks. What

12   this all boils down to, Your Honor, is analyzing the plain

13   meaning of the indemnification provision to determine whether

14   the parties intent was to have Genesis indemnified to Mellon

15   with respect to the claims asserted in the Haskel complaint.

16    THE COURT: Indeed. And of course I've familiarized

17   myself with the language of the agreement between then

18   Genesis and - - who are we talking about? It's been a long

19   morning. And Mellon. And, you know, I understand - - let's

20   take - - it seems to me that on the first argument of

21   NeighborCare/Genesis, that the language of 10.06, in any way

22   relating to the transactions contemplated hereby, does not

23   include anything but the DIP financing arrangements and any

24   allegations of fraud and gross negligence, and so forth,

25   connected with the confirmation process, have no place in

that language. In reply to that, the other side, Mellon, argues that if we look at the complaint in the particular paragraphs that are highlighted, the Haskel complaint, and paragraphs 154 through 157, 161, 163, 165, and 167, that there is specific mention of how the use of the DIP financing relates and was a part of the alleged fraud and gross negligence exercised by Mellon in conspiracy with Goldman, Saks and the like. How can we then understand the contention of NeighborCare that this language would not apply to the Haskel complaint.

MS. HARVEY: Certainly, Your Honor. The key in Section 10.06 of the DIP financing agreement provision dealing with indemnification is that it has to arise out of claims made by a person in any way relating to the transactions contemplated hereby. Your Honor, here there are allegations in the Haskell complaint that Mellon Bank was a DIP lender, and that Mellon Bank allegedly coerced the Debtor to draw down on the DIP loan. But there are no claims in the complaint that allege those two allegations as being wrongful, and that seek to recover monies from Mellon with respect to it. Let me give you an example, Your Honor, of something that would be covered under 10.06, the indemnification provision. If the plaintiffs in Haskel were suing Mellon alleging that Mellon forced Genesis to draw down on the DIP, and they sought from Mellon the fees that Mellon

got in connection with forcing Genesis to draw down on the DIP, then I could see that that is a claim made by the plaintiff, and that it relates to the transactions contemplated under the DIP financing agreement. No such claim is in Haskel. The Haskel complaint, the claim in Haskel, is that there was fraud or gross negligence with respect to pre-petition senior debt holders who held approximately $1.3 billion of senior debt. And that those senior debt holders committed fraud or gross negligence in conspiring with the Debtor to rig the valuation so that these pre-petition senior debt holders could get as much equity, and in this case the plaintiff alleges more equity, than they were entitled to - -

THE COURT: Yes.

MS. HARVEY:  - - under the plan.

THE COURT: And that was certainly not limited to pre-petition conspiracy or fraud. It was a continuing, it is alleged, a continuing process comprised of many things being done. Including not only the actual advancement of DIP financing, which it is alleged advanced the opportunity to reduce the value, or increase the amount of secured claims. Whether this is all true or not is not the point, of course. I'm not sure I understood your first statement. Whether - - you said that no claims are asserted here, it is only alleged that these things happened. Do you mean by that - - you seem

1   to mean more than that this is all premature. That you need

2   a final judgment, as the provision says. I'm not sure I'm

3   following your argument.

4           MS. HARVEY: Sure, Your Honor. What I'm saying is

5   there are allegations in the complaint with regard to Mellon.

6   There are allegations that say Mellon held senior debt.

7   There are allegations that Mellon was a DIP lender. But the

8   claim, and you have to focus on the claim being made by the

9   plaintiff. The claim being made by the plaintiff isn't that

10   Mellon committed fraud in connection with something in the

11   DIP financing agreement, or with respect to the loan itself.

12   The claim is that Mellon, by virtue of it being a senior debt

13   holder, not a DIP holder, but a senior debt holder, conspired

14   with the Debtor to do something wrongful. And that's the

15   distinction. You can make - - I can make an allegation in a

16   complaint, Your Honor, but that doesn't amount to a claim.

17   And 10.06 of the DIP financing agreement is very clear. It

18   has to be a claim. It doesn't have to be - - it doesn't say

19   that arising out of allegations made by a party relating to

20   the transactions.

21           THE COURT: Nor does it say, in any way - - it says

22   relating to a claim. Whether it's established or not is

23   another question. But it says claim relating to the DIP

24   financing. That's the transactions contemplated hereby.

25           MS. HARVEY: Correct.

FORM FED 25   FENGAD · 1-800-631-6989

THE COURT: To use the DIP financing, it is alleged, as a tool for defrauding the estate, or the creditor body, or the Debtor, or the bond holders, or the shareholders, or whoever in the Genesis case, would be a claim relating to the DIP financing, wouldn't it?

MS. HARVEY: If that was the claim in the Haskell complaint, Your Honor. But here it isn't. There isn't a claim, a claim that says no one committed fraud because as a result of something they did with respect to the DIP financing agreement, they are liable. That's not what the claim in Haskel says, Your Honor. It wouldn't matter. Take out the allegations relating to whether Mellon was a DIP financier or not, and you still have the claim. The core claim. And it's again and again, you know, it's quite clear - -

THE COURT: Well, you might - -

MS. HARVEY: - - what is being alleged here.

THE COURT: - - you might, but does that remove the language of 10.06? In other words, if there was no tie in, then you wouldn't have an indemnification claim. Then I would accept your argument. You know, as I read your argument first, without reference to these, quote, "tie-ins" to the Haskel complaint, the specific references to the DIP financing, the use of the DIP financing, the alleged use of the DIP financing as a part of this broader scheme, I said,

Yeah, this looks like this was intended only to apply to the terms of the DIP financing. What are we talking about? Does the Haskel complaint - - and I of course revisited the Haskel complaint - - focus on matters involving the DIP financing? I don't think so. Of course, I was reminded by these particular provisions that indeed the DIP financing was specifically included as a part of the broader allegations of fraud engaged in by these three senior lenders in whatever capacity. You're suggesting that we ignore the fact that Mellon Bank stood in both capacities. As the lead DIP lender, financing lender, and as a senior lender pre-dating the petition.

MS. HARVEY: Let me address two points, Your Honor. The allegations in Haskel with respect to the draw down on the DIP, the allegation itself says that Genesis could have paid it through it's own cash flow, and so therefore Mellon and others allegedly coerced the Debtor to draw down. But in terms of the valuation, which is the key point here, because that is the wrongful conduct that we're dealing with is that there were EBITDA, budgeted EBITDA projections that affected the valuation, and basically rigged the valuation for the senior debt holders who got most of the equity in the company. That valuation wouldn't have been effected if Genesis didn't draw down on the DIP, but instead did pay, through working capital, those expenses. Are you with me,

Your Honor?

THE COURT: I think so. But - -

MS. HARVEY: Okay. Second, Your Honor - -

THE COURT: Go ahead.

MS. HARVEY: - - with respect to the DIP loan itself, Mellon was entitled to administrative expense priority. There isn't any impact with respect to this. There's no way that a plan would have been confirmed without Mellon Bank, the DIP lender, being paid off in cash. They weren't being paid in equity, Your Honor. I could understand if the allegation was that not only did Mellon hold debt participations, but they held the loan with respect to the DIP financing agreement. And in so doing, they got equity based upon both the debt participation, and the fact that they were a DIP lender. That isn't the case here, Your Honor.

THE COURT: But isn't it alleged that partially because of the manipulation with the DIP financing, not only to require Genesis to draw down, but to manipulate the resources of MultiCare versus Genesis, and to require Genesis to draw down, but not MultiCare, and all of that, that that whole exercise, as a part of other activities, contributed to a return to Mellon with it's other hat on. As a senior pre-petition lender. That its exercise of its DIP financing role helped it to conspire with the other senior pre-petition

1  lenders to obtain more than they were entitled to otherwise.

2  MS. HARVEY: Well, first of all, the cause of action

3  dealing with fraud, if you look at paragraph 185, it doesn't

4  allege that Mellon took the steps, it actually alleges that

5  Goldman - - and I can read it to you, it's on page 83 of the

6  complaint. "Goldman also took all the steps needed to freeze

7  MC's cash and lines of credit so that it could not pay its

8  obligations of debt to Genesis. Thus forcing Genesis to draw

9  down almost 200 million from its DIP lending facility."

10  THE COURT: Indeed, many of the paragraphs are aimed

11  at Goldman. The paragraphs that were specifically cited that

12  I recited a few minutes ago do include specific reference to

13  Mellon. Again, whether they're accurate or not, or to be

14  proven or not, is another question. But the specific

15  references to Mellon are there.

16  MS. HARVEY: Yes, Your Honor, but there is no

17  allegation in the Haskel complaint that the draw down of the

18  DIP had, in any way, an affect on the valuation. And that's

19  what the core here is, is the valuation.

20  THE COURT: I wonder about that. If we look at - -

21  certainly maybe not in 154. There is a description of the

22  financing. The use of the monies.

23  MS. HARVEY: Right. But the monies had to be, they

24  had to be paid. Genesis was obligated to make those payments

25  whether they drew down on the DIP or they took it out of

1  their own working capital, Your Honor.

2  THE COURT: We're talking about allegations of

3  wrongdoing.  We're talking about a complaint that says it's

4  possible that these things were a part of a fraud - - we

5  contend that these things, requiring Genesis to draw down,

6  paying from the DIP facility, were part of the fraudulent

7  scheme.  That's what's alleged.

8  MS. HARVEY: Right.  But the fraudulent scheme

9  relates to senior debt holders.  Not to a DIP lender.

10  THE COURT: Understood.  Perhaps we can move to the

11  second argument you've advanced.  That the, that there is an

12  exclusion - -

13  MS. HARVEY: Yes there is.

14  THE COURT:  - - for loss sustained from gross

15  negligence or fraud if - - what would be your position?  If I

16  conclude that the language of 10.06 is broad enough to

17  include indemnification for attorney's fees expended in the

18  context of Haskel, except for the exclusion, and if there is

19  a determination that there is no gross negligence or fraud,

20  would you then concede that the paragraph would require

21  indemnification?  I mean, that's a big if in the first

22  instance.  I'm drawing you beyond your first argument.  If

23  your first argument is unsuccessful - -

24  MS. HARVEY: If we're wrong, Your Honor, on 10.05,

25  and the claims in Haskel do relate to the DIP financing - -

1    THE COURT: You mean 10.06?

2    MS. HARVEY: Sorry. 10.06. And the claims alleged

3    against Mellon in Haskel do relate to the DIP financing

4    agreement, then I would agree with you, Your Honor. If

5    Mellon is not found liable, then we would be indemnifying

6    them with respect to attorney's fees and costs. However,

7    Your Honor, the concept of indemnification and advancement of

8    defense costs are two separate legal concepts.

9    THE COURT: So you're really saying, are you not,

10   that it's premature? That let's resolve, as I hope to do

11   very shortly, the Haskel matter, and then see where this

12   takes us.

13   MS. HARVEY: I'm saying that, Your Honor, and I'm

14   also saying that the provisions in the DIP financing

15   agreement do not contain an advancement of cost provision.

16   And so when we read the plain language of the agreement, if

17   the parties intended to have defense costs advanced, then it

18   should have been in the agreement. It's not.

19   THE COURT: What do you say to the references by

20   Mellon to the various provisions, I don't know - -

21   MS. HARVEY: Sure.

22   THE COURT:  - - 2.26.

23   MS. HARVEY: Section 2.26, Your Honor? Which - -

24   THE COURT: The on demand, if we spend money, you

25   pay us.

MS. HARVEY: No. It actually says - - it deals with payments of obligations. And obviously, if there's no obligation to advance defense costs, then there's no obligation under Section 2.26. The other provision, Your Honor - -

THE COURT: Is indemnification included in obligation? In the definition of obligation?

MS. HARVEY: No. I believe the obligation deals with monetary payments.

THE COURT: Obligation is a defined term, is it not?

MS. HARVEY: Yes, Your Honor.

THE COURT: I'm just looking for it. Obligations shall mean the due and punctual payment of principle of and interest on the loans and the reimbursement of all amounts drawn under letters of credit. And be the due and punctual payment of the Fees, capital f, and all other present and future fixed or contingent monetary obligations of the borrower, and the guarantors to the banks - -

MS. HARVEY: And Mellon relies on the monetary obligation part - -

THE COURT: Right.

MS. HARVEY: - - Your Honor. And, as I said, if there's no advancement of cost, then there's no monetary obligation that has arisen.

THE COURT: And even if it's a contingent

1   obligation, a contingent monetary, contingent upon the

2   exclusion, so goes their argument, I guess.

3           MS. HARVEY: Yes, Your Honor.

4           THE COURT: Contingent upon the exclusion not being

5   applicable here.

6           MS. HARVEY: Or, said another way, contingent upon

7   there actually being an obligation.

8           THE COURT: Right. But it says "contingent". Does

9   that change the equation in terms of whether the immediate

10  - - the demand, the on demand nature of payments with regard

11  to obligations, even though the indemnification clause

12  doesn't speak in terms of advances for defense costs?

13          MS. HARVEY: But this isn't - - I mean, the point

14  here Your Honor is there never is an advancement of costs

15  with respect to these claims. And so you never have any

16  contingent obligation with respect to advancement of costs.

17  You only - -

18          THE COURT: Well, I mean - -

19          MS. HARVEY: You only have the contingent obligation

20  with respect to whether there is an indemnification. And we

21  don't know at this point. How can I make payments if I have

22  no clue what the payments are going to be in terms of

23  attorney's fees. That makes absolutely no sense. You can't

24  read the provision to - - in a way that's nonsensical. And

25  what you really have to focus in, is on the provision that

1  talks about what they're entitled to if they are indemnified.
2  And that provision is quite clear. It does not say there's
3  advancement of defense costs. And the Courts in Delaware,
4  and there's a number of cases that I cite to you in my brief,
5  Your Honor, they're very clear that there's a distinction, a
6  legal distinction between giving somebody indemnification and
7  giving them, on the other hand, advancement of defense costs.

8        THE COURT: Understood. Thank you counselor.

9        MS. HARVEY: Thank you, Your Honor.

10       MR. ZELMANOVITZ: Good morning, Your Honor.

11       THE COURT: Good morning.

12       MR. ZELMANOVITZ: Menachem Zelmanovitz of Morgan
13  Lewis on behalf of Mellon Bank. I will try to be brief,
14  because I see Your Honor is very up on all of our briefs.
15  But there are a number of additional items I would like to
16  make a point of, as well as to address some of the issues
17  Your Honor raised with Ms. Harvey. I think one of the things
18  we're missing here is that we're not limited to money lent
19  and repaid as for what claims could be related to. It says
20  "transactions contemplated by this agreement". That is a
21  much broader concept. If one were to look, in fact, at our
22  DIP agreement, one can begin, almost from the beginning, and
23  see how much more is in fact involved in the nature of
24  transactions. The granting and perfection of liens, the
25  issuance of letters of credit, guarantees of the obligation

under the agreement, the commitment by each bank to lend, the ability of the Debtor to terminate commitments, payment of taxes, of fees. On and on and on. Execution and delivery of loan documents. Each of these is a transaction contemplated by the DIP agreement. So we are not limited to just the payment or repayment of the DIP loan. In fact, certain of the provisions here, or the other transactions, are specifically referenced, as Your Honor has already noted, in the Haskel complaint. The use of the proceeds of the DIP to pay certain pre-petition debt, the tranche to revolver, that is in Section 3.11 of the DIP agreement, specifically referenced in the Haskel complaint, as Your Honor knows. Being able to monitor the DIP loan. Monitoring the collateral of the DIP loan, which we provide for in the DIP agreement in Section 5.08, again, specifically referenced among the, quote, "wrongful", close quote, conduct in the Haskel complaint. In fact, even the plan of reorganization, which counsel says has nothing to do with the DIP agreement, and therefore the Haskel complaint, which obviously focuses on the plan of reorganization, doesn't relate to the DIP agreement, well, even the plan of reorganization was a transaction contemplated by the DIP agreement. And the proof of that is it's defined, first of all, in Section 1.01 of the DIP agreement, and there's a specific provision in Section 2.27 relating to the plan. As to obligations which are not

going to be discharged. Once it's a transaction contemplated by the DIP agreement, then claims relating to it in any way are clearly covered under the plain language of 10.06. I would also point out the breadth of this provision. And in that connection, I would specifically refer the Court to the Pitney Bowes case, which we have cited in our brief. In that case you have almost the identical language that we have here, and the Court there held not only did the relating to language already provide expansive indemnification coverage, but that the scope of such coverage was broadened, quote, "even further by requiring only that the dispute in any way relate." But as Your Honor has already noticed, this entire issue is really a red herring, because the Haskel complaint can't be any clearer. You've already noted to Ms. Harvey the various provisions and paragraphs in the complaint. In fact, there are two separate sections of the Haskel complaint. Section K, which is increasing the senior creditor claims. And then there is Section 4, each defendant participated and had knowledge of the misrepresentations. Specific paragraphs under each of them clearly, clearly involve supposedly wrongful conduct involving the DIP agreement. Now there's some arguments that Ms. Harvey made. She says the claim is that Mellon, as a senior debt holder conspired. Well, that just doesn't - - that is not the case. Fraud, the fraud claim is based on a pattern of conduct. The pattern of

1  conduct here clearly includes conduct in connection with the

2  DIP agreement. After setting forth the use of the proceeds,

3  in mean, in paragraph 156, I quote from the complaint, "had

4  the senior creditors not interfered, Genesis could have paid

5  these charges out of its regular cash flow without utilizing

6  the DIP claim facility, and without gratuitously increasing

7  the claims of the senior creditors by 200 million." But

8  specifically to answer your - - one of the items that Ms.

9  Harvey said that it wasn't tied to valuation. Well , it

10  certainly was in paragraph 161. Which says, "collectively,

11  these actions strip Genesis of well over 200 million in

12  operating capital, and contributed directly to it's need to

13  draw upon the equivalent amount of DIP financing" - - and

14  here's the point - - "further assuring that the senior

15  creditors would be deemed impaired." That's valuation.

16        THE COURT: What about - - and I do understand the

17  argument that the language of 10.06 incorporates this Haskel

18  complaint, as well that if the exclusion is effective, then

19  Mellon is not entitled to recover, and we won't know that

20  until it's done. Why do you think that it makes sense to

21  honor the seeming application of the on demand obligation, if

22  you will, when against that we have no provision for

23  advancement of defense costs, in particular, and we have a

24  prospect that if that exclusion doesn't - - if it applies,

25  then Mellon would not be entitled to any indemnification? I

1  mean, why would we - -

2  MR. ZELMANOVITZ: You're asking me to get to the

3  second point, Your Honor. I understand.

4  THE COURT: And/or the third. I mean, it's almost

5  the third. Is it premature?

6  MR. ZELMANOVITZ: Well, the second, I think has been

7  dropped already. I think they've agreed that we are covered

8  if ultimately the exclusion doesn't apply.

9  THE COURT: I think that was an acknowledgment, yes.

10  We're really on the third point. Isn't it premature?

11  Shouldn't we resolve the question of the application of the

12  exclusion?

13  MR. ZELMANOVITZ: Let me get to that. If I may,

14  just to clean up the last point I was making. Because there

15  is one more item I would like to mention to Your Honor which

16  we did not have in our briefs. And that is the Haskel

17  plaintiffs themselves have described their claims. And they

18  did so in the memorandum in opposition to the motion to

19  dismiss, which Your Honor obviously can take judicial notice

20  of, it's part of your docket. And we have copies here if you

21  would like. May we approach?

22  THE COURT: Certainly. I'm - -

23  MR. ZELMANOVITZ: I would just like to reference a

24  part in one page.

25  THE COURT: That's fine. I'm just concerned that it

1  wasn't mentioned in the submissions. At least not that I

2  saw. That's what concerns me.

3  MR. ZELMANOVITZ: Well, I have no objection to their

4  responding to this. But it's something I think Your Honor

5  should take notice of. And you could take notice of it on

6  your own, because it's part of your - -

7  THE COURT: I could tell you that I'm well familiar,

8  and even recently, very recently, with the contents of those

9  briefs and the arguments advanced.

10  MR. ZELMANOVITZ: Your Honor, let me, then, just

11  mention, before I complete this, that on page 26, in the

12  clearest of terms, the Haskel plaintiffs say the following:

13  "The evidence will show that Goldman, Highland, and Mellon,

14  in their capacity as DIP lenders, were direct participants in

15  this fraud." I don't think you have to go any further on

16  that.

17  THE COURT: And I think that the - - I will agree

18  with you, that the paragraphs that you've recited say that as

19  well. In variations on the theme. So, I am prepared, at

20  least perhaps as a matter of partial summary judgment to

21  reflect that the language of 10.06 does include the

22  allegations of the Haskel complaint as arising out of claims

23  made by any person in any way relating to the transactions

24  contemplated hereby. The transactions contemplated hereby

25  obviously do related to the DIP financing. The transaction

that was, that is the document that we're - - the revolving
credit and guarantee agreement among Genesis and Mellon and
et al., if you will, I must reject the contention of
NeighborCare/Genesis that there is no claim here because the
events here, or the allegations in the Haskel complaint are
aimed at Mellon as a senior debt holder rather than as a DIP
financier. The Haskel complaint, indeed, aims at Mellon I
would suggest in both capacities, as senior note holder, or
debt holder, who is utilizing the DIP financing arrangements
to impact upon its senior debt holder status, in a way that
is alleged to be fraudulent or grossly negligent, and that
the Haskel complaint therefore does relate to the DIP
financing in the paragraphs that we have recited here. I can
also conclude that if there is a finding of gross negligence,
or fraud, against Mellon in the Haskel complaint, that there
is no entitlement to indemnification. We are up to the third
issue, and that is the juxtaposition of the on demand clauses
versus the recognition that 10.06 requires final judgment to
understand the implications of the exclusionary provision.

MR. ZELMANOVITZ: And I think Your Honor has already
touched on the planning issue, and our position there. 10.06
has to be read together with 2.26 and the definition of
obligations. Obligations, as defined in the DIP agreement,
clearly include indemnification obligations. And since they
include indemnification obligations, they must be paid

immediately under 2.26. Now to say that the payment of expenses is not provided for, ignores the fact that the indemnification obligation specifically includes expenses. So the indemnification obligation which is - - clearly sets forth not only claims, not only liabilities, it includes specifically expenses as part of what Mellon has to be indemnified for, that's part of the indemnification obligation. And under 2.26, that has to be paid immediately. Now you must read even the exclusionary language the same way. And I'll tell you why. If you - - the exclusionary language means that you must continue paying this indemnity, including the reimbursement or paying for the attorney's fees, until such time as you have a final judgment.

THE COURT: Where does it say that?

MR. ZELMANOVITZ: Because if it doesn't mean that, the words determined by the final judgment have no meaning. And in fact, that's what the cases have held. If Your Honor would - - we've referred Your Honor in our brief to the case of Little vs. MGIC Indemnity Corp. In there, in examining a very similar coverage exclusion in the DL policy, the Third Circuit, at page 794 said, "This division states that the insured shall be protected unless there is a judicial finding of active and deliberate dishonesty on the part of the insured." Then the Court, the Third Circuit, said, "This language certainly can not be read as postponing the

1　insurer's duty to pay until the question of the insured's

2　dishonesty is resolved." The Court went on to say and to

3　read the provision as follows, as, quote, "As imposing upon

4　the insurer a duty to pay loss, as the insured incurs legal

5　obligation for such loss."

6　　　　THE COURT: Didn't that case involve a specific

7　provision for advancement of litigation costs on, or defense

8　costs ongoing?

9　　　　MR. ZELMANOVITZ: That's irrelevant to the point of

10　whether you wait until such time of the final determination.

11　This case is telling you when you have that language of a

12　final judicial determination, you do not wait until that

13　final judicial determination to see whether you have to pay.

14　In our case, we have the same language. 2.26 tells you

15　you're supposed to pay it. What does indemnity mean?

16　Indemnity means you're supposed to pay it. The question is

17　when. As the Third Circuit said in Little, the question is

18　not whether, it's when. And the Third Circuit is telling us

19　that when is when those obligations are incurred by the

20　indemnitee.

21　　　　THE COURT: In terms of definition of obligation, it

22　focuses on fixed or contingent obligations. This is clearly

23　not a fixed obligation in terms of the amount that is due.

24　Is it contingent?

25　　　　MR. ZELMANOVITZ: Well, when we - -

1    THE COURT: From the, from the standpoint that one

2    could read 10.06, could they not, to reflect that the

3    indemnity obligation doesn't arise until the exclusion is

4    determined.

5    MR. ZELMANOVITZ: It is fixed. It is fixed. We're

6    not asking them to advance future defense costs. We're

7    asking them to pay the costs as they are incurred. They are

8    fixed at that point in time. It's contingent - -

9    THE COURT: Fixed subject to - -

10   MR. ZELMANOVITZ: Recapture. That's right. And

11   that's what the case is saying. That's exactly what this

12   language means, and that's what the case is saying. And we

13   would ask Your Honor to read those cases carefully. That's

14   exactly what they say.

15   THE COURT: Is there - -

16   MR. ZELMANOVITZ: And the Webtech (phonetic) case,

17   which we also cite, says the exact same thing.

18   THE COURT: Well, let me ask you if either the

19   Webtech case or the Little case, I know the Little case has -

20   - addresses these questions in the context of an advancement

21   of defense costs clause. Does the Webtech case do the same?

22   MR. ZELMANOVITZ: I believe - - but the focus on

23   this issue is not the advancement clause. The focus of this

24   issue is on this language of final judicial determination as

25   to whether you can await that final judicial determination to

FORM FED-25 ® PENGAD • 1-800-631-6989

pay if you have that language. In other words, does potential future contingency as to whether you had an obligation, can you await that to pay, and both cases say no. It has nothing to do with how you say you're supposed to pay. In our case, we're not talking about a normal insurance policy. We're talking about a contractual matter between a lender, which is somewhat different. That the indemnity language means you're supposed - - what is an indemnity of expense mean? If it doesn't mean to pay the expense, I don't know what it means. It means you're supposed to - -

THE COURT: A person - -

MR. ZELMANOVITZ: - - if we incur an expense, you're supposed to pay it.

THE COURT: Except that you have a final judgment that has - -

MR. ZELMANOVITZ: And that, those cases say when you have an obligation, you don't wait for that final judgment. That's what the _Little_ and the _Webtech_ cases say.

THE COURT: Let me ask you whether there's any import in Section 2.26 to the phrase "upon the maturity, whether by acceleration or otherwise, of any of the obligations under this agreement - -

MR. ZELMANOVITZ: Yes. That's what I would - -

THE COURT: - - the banks - -

MR. ZELMANOVITZ: That is, if you say - - the answer

to that is if you say that this obligation does not arise until you actually finally determine - - if you want to read 10.06 to say you don't get paid until there's a final determination, and if that final determination is that you are innocent of any wrong willful doing, then you get paid. Then we don't insure until then. That's not what 10.06 says. 10.06 does not say. 10.06 says you are indemnified, but there's an exclusion if there is going to be a final judicial determination. And the cases clearly say that means you don't wait until then, but if that does occur later on, you get reimbursed.

THE COURT: Do those - - does _Little_ and _Webtech_ arise, do both of those cases arise in the context of insurance - -

MR. ZELMANOVITZ: Yes.

THE COURT: - - rather than indemnification?

MR. ZELMANOVITZ: There are very few indemnity cases. As far as I, I believe _Little_ is as well. I'm looking at my associate, who probably knows better than I do.

THE COURT: Understood. All right. Thank you, sir.

MR. ZELMANOVITZ: Thank you.

MS. HARVEY: Your Honor, may I just briefly - -

THE COURT: Of course.

MS. HARVEY: - - be heard on the _Little_ and _Webtech_ cases? Your Honor, specifically - - and Your Honor is

correct. These are both director and officer liability issues where there's an indemnification provision by an insurance company, and there is a dispute as to whether the directors one, should be indemnified, and two, whether their defense costs should be paid. With respect to _Little_, Your Honor, the Court actually found that the language was ambiguous, and in doing so construed the language against the insurance company. Which is what typically is done when you're dealing with insurance policies that are ambiguous. The Court will say the insurance company was the big boy, they were sophisticated, they directed the language, if it was ambiguous, well, that's just tough. That's _Little_, Your Honor. That has nothing to do with this case. _Webtech_. In _Webtech_, Your Honor, there wasn't any language with respect to a final judgment of a Court of competent jurisdiction. What there was is a typical insurance policy provision that obligated the insurer to pay, on account of all claims made for wrongful acts. And then at the end it says, and defense costs. And the dispute was what does that mean? What does defense costs mean? Again, Your Honor, that is not the issue here. What is interesting, though, is if you look at the provision that is in, that is contained, the exclusion provision, this is very similar to language that appears in terms of indemnifying directors. And in situations where directors are indemnified, typically there is an undertaking

provision that the director has to undertake to pay the money back. Makes a lot of sense. If I'm going to be advanced, receive advance costs for something that I may eventually not be indemnified for, then I need to do an undertaking to say, I'm going to give the money back. Well, there's nothing in the DIP financing agreement that provides any undertaking by Mellon to pay us back if we advance defense costs. And I submit to Your Honor that is strong evidence of the parties intent not to have advancement of costs.

MR. ZELMANOVITZ: Your Honor, if just may, I have - -

THE COURT: Last comment.

MR. ZELMANOVITZ: The actual cases that we cited to you say that that must be, in fact, read into the provision. In - - if you take a look at Little, and there are other cases which we cited in our briefs, they actually say that because we are saying that you must pay until this subsequent determination, if there is such a subsequent determination, we must interpret this policy as meaning, as implying that you must have an obligation to pay back. You didn't have to say that. That comes by the fact that there was this exclusion. That's what the exclusion means.

THE COURT: I think that - - my initial reaction is that I think a critical distinction can be made where there is an insurance situation. But here's what I'm going to do,

because I do understand the respective arguments of the parties. I will take the opportunity to return to the <u>Little</u> case, the <u>Webtech</u> case, and the other cases cited by both parties on this point. I see that this is the only point that I believe needs to be resolved. I hope that I have created a record to resolve the other points, if you will. I won't go back to that. But, I think that it is important that I have a clear sense of the application of those cases to the remaining issue. Perhaps I can schedule a conference call that I might share with you the results of my review. That might be the most expeditious way of addressing the final point. How about next Friday afternoon? Would that be available? Say, 2 o'clock?

MS. HARVEY: That's fine.

MR. ZELMANOVITZ: I am scheduled to go on jury duty.

THE COURT: Wow.

MR. ZELMANOVITZ: Of all things. Beginning Tuesday.

THE COURT: Oh, okay.

MR. ZELMANOVITZ: I hope to be available.

THE COURT: If you're not, you're welcome to let us know, and we can adjust it. My purpose is only to decide the issue, so if someone else is on the line, that's okay too. But if you are tied up, and you want to participate, I'll adjust the time for you. You'll let us know.

MR. ZELMANOVITZ: 2 o'clock next Friday, Your Honor.

1   Will it be through chambers here, or will it be in Camden?

2   THE COURT: I will be in Camden.  And I would

3   appreciate perhaps counsel, Ms. Harvey, putting that call

4   through?

5   MS. HARVEY: Certainly, Your Honor.

6   THE COURT: I'd appreciate it.  And hopefully we

7   will get the Haskel matter resolved as well.  Anything else

8   on this record?

9   MS. HARVEY: No, Your Honor.

10   MR. ZELMANOVITZ: No, Your Honor.

11   THE COURT: I thank you all.

12   MS. HARVEY: Thank you, Your Honor.

13   MR. ZELMANOVITZ: Thank you very much.

14   (Whereupon at 11:35 a.m. the hearing in this matter was

15   concluded for this date.)

1

2    I, Jennifer Ryan Enslen, approved transcriber for

3    the United States Courts, certify that the foregoing is a

4    correct transcript from the electronic sound recording of the

5    proceedings in the above-entitled matter.

6

7    _Jennifer Ryan Enslen_                    2/28/05

8    Jennifer Ryan Enslen
     18 Bar Drive
     Newark, DE 19702

9    (302) 836-1905

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25